## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

PERRY D. McCLOUD,

        Plaintiff,

v.                                                          ACTION NO.
                                                            2:04cv677

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.


## UNITED STATES MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff brought this action under 42 U.S.C. § 405(g) and 42 U.S.C. §1383(c)(3) seeking judicial review of the decision of the Commissioner of Social Security ("Commissioner") denying his claim for disability and disability insurance benefits under Title II of the Social Security Act.

This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia. The Court recommends that the final decision of the Commissioner be REVERSED and REMANDED for payment of benefits.


## I.  PROCEDURAL BACKGROUND

On February 15, 2002, Perry D. McCloud ("Mr. McCloud") filed an application for disability and disability insurance benefits with the Department of Health and Human Services of the Social

Security Administration. (R. 48-50).[1]  He alleged an onset of disability as of June 1, 2000, due to seizures, a knee condition, and headaches. (R. 66).  This application was denied by the Social Security Administration initially and on reconsideration. (R. 35-37, 40-42).

Mr. McCloud requested a hearing before an Administrative Law Judge ("ALJ") of the Social Security Administration which was held on July 15, 2003.  (R. 293-316).  He was represented by Wanda Wright, Esq. at the hearing.  (R. 293).  Mr. McCloud, a vocational expert, and Mr. McCloud's wife, Annette McCloud, testified at the hearing.

On August 26, 2003, the ALJ issued a decision. (R. 15-26).  The ALJ found Mr. McCloud was capable of performing a limited range of light work; therefore, he was not entitled to disability benefits because he was not under a "disability" as defined by the Social Security Act.  (R. 25-26).  Additional evidence was submitted to the Appeals Council of the Office of Hearings and Appeals of the Social Security Administration (R. 235-288); however, the Appeals Council denied review of the ALJ's decision on September 25, 2004.  (R. 5-7).  This makes the ALJ's decision the "final decision" of the Commissioner subject to judicial review here, pursuant to 42 U.S.C. § 405(g).

Mr. McCloud filed a complaint on November 10, 2004, seeking review of the decision of the Commissioner denying his claim for disability and disability insurance benefits.  The defendant answered on January 21, 2005.  Mr. McCloud filed a Motion for Summary Judgment with a supporting memorandum on March 18, 2005, and defendant filed a Motion for Summary Judgment with supporting memorandum on April 18, 2005.  As neither counsel in this case has indicated special circumstances requiring oral argument in this matter, the case is deemed submitted for decision based on the memoranda.

---

[1]      "R." refers to the administrative record.

## II. FACTUAL BACKGROUND

Mr. McCloud was a forty-eight year old man at the time of the hearing in this matter.  (R. 296).  Born June 24, 1955, he is presently fifty years old.  (R. 48).  He graduated high school (R. 104), and his past relevant work experience[2] included work in a warehouse, as a truck driver and as a shipping and receiving clerk. (R. 85).  Mr. McCloud alleges he has been disabled since June 1, 2000, due to headaches, knee pain, depression, and seizures.

### A.  Medical Evidence in the Record

Neurologist Thomas R. Pellegrino, M.D., first treated Mr. McCloud for seizures in August of 1998. (R. 189).  Mr. McCloud described waking up in his car after eight hours, noticing he had bitten his tongue and had bladder incontinence.  Mr. McCloud reported having seizures over the past three to four years for which he had been prescribed Depakote[3], but admitted he had stopped taking the medication eight months prior.  He was given a new prescription for Depakote, but did not return for his follow-up appointment.

The record indicates that Mr. McCloud had a right knee arthroscopy in January 2000. (R. 140).  Follow-up notes from June 13, 2000, indicate that Mr. McCloud complained of some discomfort when he did a lot of jumping, and a giving way sensation when he goes up a step, but examination indicated that he had a good range of motion, and there was no puffiness or tenderness. (R. 139).  Dr. Schaffer told Mr. McCloud that he might  not be able to play basketball like he did

---

[2]        Past relevant work experience is defined as substantial gainful activity in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. § 416.965(a) (2004); 20 C.F.R. § 404.1565(a) (2004).

[3]        Depakote (Divalproex Sodium) is indicated for use in the treatment of mania, epilepsy, and migraine. Physicians Desk Reference 59th Ed. 2005 ("PDR"), p. 430.

when he was younger and to stay away from as much squatting and stooping as he could.  He was given anti-inflammatories and some exercises.

On November 28, 2000, Mr. McCloud was seen by internist Alan M. Cohen, M.D., after Mr. McCloud noticed a lump on the right side of his head which was becoming tender and increasing in size. (R. 166).  Examination revealed a 1 ½ to 2 centimeter soft lipomatous mass. The lipoma was excised by Dr. Dimick in December of 2000, and Mr. McCloud was given a prescription for Ibuprofen 600 mg. (R. 164).

On March 16, 2001, Mr. McCloud complained of pain in his right knee, and in the area of the lipoma excision. (R. 163).  Physical examination of the right knee revealed moderate effusion and some synovial thickening, with no crepitance, warmth or point tenderness, and full range of motion. (R. 163).  Examination of the scalp revealed a well-healed scar, but the examination notes are cut off at this point where a page is missing from the medical record.

He next saw Dr. Schaffer nine months later, on March 30, 2001. (R. 137).  Notes from this visit indicate that Mr. McCloud reported an occasional ache in his right knee if he is on it for a period of time, or if he does a lot of heavy activity. (R. 137).  X-rays showed some narrowing of the medial compartment.  He also complained of significant left knee pain with swelling for about 10 days which occurred after he got out of a squat and felt a pop in his knee.   Examination was consistent with a meniscal tear.

On May 2, 2001, Mr. McCloud had a left knee arthroscopy. (R. 135).  On follow-up one week later, his sutures were removed and he was instructed on bicycle riding and straight leg raising, and told to wean himself off of the crutches. (R. 134).   Dr. Schaffer released Mr. McCloud from work for 10 days, but felt he could return to work after that time.

4

On June 15, 2001, Mr. McCloud sought treatment from Dr. Cohen for a syncopal episode that lasted a few seconds. (R. 162).  He was lightheaded, bit his tongue, fell to the ground, and had a subsequent confused mental state.  Mr. McCloud reported that he was last treated by a neurologist for seizures in 1998, and that he stopped his medication at that time.  His last seizure had occurred 1 ½ years prior.  Examination and an EKG were normal.  Dr. Cohen felt that the syncope was most likely due to a seizure, however he also ordered a stress echo and a 24-hour Holter monitor. (R. 161).  Mr. McCloud admitted that he drinks heavily at times.  Mr. McCloud was put on Dilantin[4] and Depakote and told not to drink alcohol. (R. 160-161).

On June 22, 2001, Mr. McCloud reported that he had a seizure the night before resulting in several minutes of confusion, tongue biting, urination, and a severe right-sided headache which lasted through the time of the visit. (R. 160).  He stated this was unusual, since his headaches were not usually tied to seizures.  Mr. McCloud's labs were unremarkable.  Dr. Cohen spoke to Dr. Marc Rice about Mr. McCloud's headache.  Dr. Rice, who practiced with Dr. Pellegrino in Neurology Consultants of Tidewater, PLLC, reported that he was familiar with Mr. McCloud and that he had been very unreliable.  Dr. Cohen increased Mr. McCloud's dosage of Depakote, and prescribed Fiorinal with Codeine for headaches.

On June 29, 2001, Mr. McCloud reported no further seizures. (R. 159).  His medication levels were checked and found to be subtherapeutic and his doses were increased.  Mr. McCloud complained of severe headaches which were continual with exacerbations. (R. 159).  He was

---

[4]      Dilantin (Phenytoin) is indicated for use in the treatment of epilepsy. PDR, p. 2578.

prescribed Maxalt[5] to take in conjunction with the Fiorinal with Codeine[6].

On July 13, 2001, Mr. McCloud was still having severe headaches, though he reported they did respond to Maxalt. (R. 158).   Propranolol LA[7] was added to his other headache medications. He reported no significant seizures with his current medication regimen, and Dr. Cohen found his seizures were much better controlled.  An MRI (magnetic resonance imaging) of Mr. McCloud's head was performed on July 21, 2001, with normal results. (R. 155).

Notes from Dr. Cohen from August 9, 2001, indicate Mr. McCloud stopped taking his seizure medications and had a seizure. (R. 154).   However, Dr. Cohen noted that since resuming the medication, Mr. McCloud has done well, and said he was feeling fine.  Dr. Cohen threatened to remove him from his practice, but Mr. McCloud promised to be compliant. The notes also indicate that his headaches were controlled with medication. (R. 154).

Mr. McCloud returned to Dr. Pellegrino on August 17, 2001, who noted that over the past several months, Mr. McCloud had several seizures, and Dr. Cohen had made several changes in his medications.  (R. 187).  Despite having prescriptions for seizure medication in June and July, testing levels were virtually undetectable, and Mr. McCloud admitted that he missed a few pills.   Mr. McCloud stated that since taking the medication regularly he had no further seizures.  However, Mr. McCloud reported chronic dull headache with episodes characterized by very severe, almost

---

[5]     Maxalt (Rizatriptan Benzoate) is indicated for the acute treatment of migraine attacks with or without aura in adults. PDR, pp. 2077-78.

[6]     Fiorinal with Codeine (Butalbital/ASA/Caffeine/Codeine) is indicated for use in the treatment of pain. PDR, p. 3299.

[7]     Inderal LA (Propranolol Hydrochloride) is indicated for use in the treatment of hypertension, angina pectoris due to coronary atherosclerosis, migraine, and hypertrophic subaortic stenosis. PDR, p. 3336.

prostrating headache which lasts a few minutes.  His wife reported he was dazed, talked nonsense, and was unsteady on his feet for five to ten minutes.  Mr. McCloud stated he feels the headaches are more of a problem than the seizures.  Dr. Pellegrino assessed that Mr. McCloud's symptoms could reflect a vascular headache syndrome or a very unusual complex partial seizure.

On September 14, 2001, Mr. McCloud reported seizure activity the night before, in which he fell to the floor in the bathroom, was incontinent, bit his tongue, and suffering pain to the hip and shoulder. (R. 185).  His dose of Valproate[8] was increased, and Dr. Pellegrino noted, " I am not sure that he is really absorbing the medication."

On October 3, 2001, Mr. McCloud's Depakote and Phenytoin[9] levels were low. (R. 184). Dr. Pellegrino noted that, "since he was already taking a large dose of Dilantin (800 mg per day), I decided to try pushing up his dose of Valproate to see if we can get adequate levels and perhaps achieve adequate seizure control."  Dr. Pellegrino also noted Mr. McCloud may be doing a little better with the increase in medication. (R. 184).

Notes from Dr. Pellegrino dated November 5, 2001, state that Mr. McCloud really seems to be doing quite well with good control of his seizures. (R. 183).  Dr. Pellegrino was considering tapering Mr. McCloud's Dilantin to reduce some of the side effects of drowsiness. (R. 183).  Notes from Dr. Cohen dated November 9, 2001, indicate that Mr. McCloud's seizure disorder was stable and that he had had no seizures for four months. (R. 153).  Further, his headaches were stable with his current medication. (R. 153).

On January 21, 2002, Mr. McCloud reported to Dr. Pellegrino that he stopped taking his

---

[8]      Valproate is the generic name for Depakote.

[9]      Phenytoin is the generic name for Dilantin.

medications about three weeks ago because of some financial concerns and because of his need to go back to work. (R. 182).   Mr. McCloud did not have any seizures while he was off his medication. He was back on his medication and seemed to be doing fairly well.  Mr. McCloud's examination was unremarkable.  The plan was to go forward with the previous plan to taper his Dilantin, because he did not respond to it that well and it seemed to make him sleepier than he needs to be.

On January 29, 2002, Mr. McCloud complained of pain in both knees when he goes up and down stairs and a little stiffness and tightness if he sits for prolonged periods of time. (R. 132).  On examination, Mr. McCloud had good range of motion, no pain on the joint line, and a little bit of mild pain with manipulation of the patella.  He was given a prescription for anti-inflammatories.

On February 13, 2002, Mr. McCloud sought treatment for pain that he sustained after inverting his right ankle while playing basketball. (R. 120-121).  On examination, the doctor noted that his right ankle was tender and swollen, but his knee and foot were not tender. (R. 121).  An x-ray showed no fracture, and he was diagnosed with a sprain of his right ankle. (R. 121, 125).  On March 12, 2002, Dr. Schaffer found that Mr. McCloud had a good range of motion in his ankle and that his sprain was resolving. (R. 130).  Mr. McCloud was given knee braces in response to his complaints that his knees were "bothering him some."   Notes from July 2003 indicate that he had good range of motion in his knees, and that injections were effective in relieving his knee pain. (R. 264).

Notes from February 15, 2002, indicate that Mr. McCloud's headaches seemed to be under much better control with Propranolol LA. (R. 152).

On February 20, 2002, Mr. McCloud appeared to have Dilantin intoxication despite his apparently low levels of medication. (R. 181).  Upon examination, he was drowsy but arousable, with slurred speech, coarse nystagmus on lateral gaze in either direction, mild ataxia on finger-nose-

finger testing on both sides and gross ataxia of his gait.  Mr. McCloud had continued to experience

occasional seizures.  Dr. Pellegrino decided to wean Mr. McCloud off this medication and replace

it with Tegretol.[10]

Notes from April 12, 2002, state that despite a change in medication, Mr. McCloud had done

reasonably well with a single seizure in March and a single seizure in April, with no seizure in the

past ten days. (R. 179).  Examination was unremarkable, and Dr. Pellegrino concluded that Mr.

McCloud's seizures seem somewhat better on his medication although he continued to have

occasional attacks.  Mr. McCloud continued to suffer with headaches which were partially relieved

with Fioricet.[11] Mr. McCloud described two types of headache.  The first results in severe localized

pain for several seconds in the area of his lipoma excision.  The second is a frequent bifrontal

headache which is dull and aching and occasionally throbbing.  The headache is often associated

with nausea, but not with vomiting.  Mr. McCloud reported these headaches can occur several times

a week, and can last as long as a day.  Dr. Pellegrino opined that Mr. McCloud's frontal headaches

probably represented muscle contraction or tension type of headaches or possibly migraines but this

was less likely.  Dr. Pellegrino did not know what to make of the severe localized headaches, and

suspected a small neuroma which could not be confirmed. (R. 179).  Dr. Pellegrino considered

prescribing Amitriptyline[12] to treat Mr. McCloud's headaches, but was concerned about initiating

---

[10]     Tegretol (Carbamazepine) is indicated for use in the treatment of epilepsy and trigeminal neuralgia. PDR, p. 2378.

[11]     Fioricet (Sodium Ferric Gluconate Complex in sucrose injection) is indicated for treatment of iron deficiency anemia.

[12]     Elavil (Amitriptyline) is indicated for use in the treatment of depression and other disorders, including neuropathic pain and headache.  Pocket Guide to Commonly Prescribed Drugs 3rd Ed., p. 44.

two drug changes at one time.

Mr. McCloud complained again of headaches on May 24, 2002. (R. 151). Dr. Cohen diagnosed occipital/global headaches. Dr. Cohen indicated that he was not sure that Mr. McCloud was taking his Propranolol LA, and asked Mr. McCloud to make sure that he is doing this.

Notes from June 10, 2002, indicate that Mr. McCloud had been discontinued on both Tegretol and Depakote and placed instead on Lamotrigine.[13] (R. 178). During the first few weeks on his new medication, Mr. McCloud reported that he had fairly frequent seizures, but that he had been seizure free for at least a month and that his last seizure was extremely mild. A brief physical was unremarkable. He was experiencing the following side effects from the medication: slurred speech, changes in vision, and mood swings.

Robert F. Castle, M.D., a state agency medical consultant, reviewed Mr. McCloud's records on June 18, 2002, and determined that he remained capable of lifting 50 pounds occasionally and 25 pounds frequently. (R. 219, 221). He was capable of standing, walking or sitting about 6 hours in a workday (with normal breaks), pushing and pulling, and occasional kneeling and crawling, but could not climb ladders or scaffolds. In considering the symptoms from his seizures and knee pain, Dr. Castle found that these symptoms were not severe enough to prevent him from lifting and carrying light objects and performing tasks that do not require him to operate dangerous machinery or function frequently in high places. (R. 224). Dr. Castle also concluded Mr. McCloud's headaches were "associated with his seizure disorder, which is now stable with medications." (R. 224). This opinion was affirmed by another non-examining state agency physician, Michael Cold, D.O., on

─────────────────

[13]     Lamictal (Lamotrigine) is indicated for the treatment of epilepsy, particularly partial onset seizures, and bipolar disorder. PDR, p. 1531-32.

December 26, 2002. (R. 225).

Dr. Pellegrino wrote a report dated July 12, 2002, stating that despite multiple different medications, Mr. McCloud continued to experience approximately two seizures per month and in his opinion, Mr. McCloud's seizure control remained unsatisfactory. (R. 177).   Dr. Pellegrino described Mr. McCloud's seizures as characterized by, "loss of contact with his surroundings, rhythmic eye blinking and lip smacking movements, and some twitching and jerking movements of the upper extremities" which last several minutes followed by ten to fifteen minutes of unconsciousness.  Mr. McCloud will fall down if he is standing when the seizure occurs and is at risk of injury.  Dr. Pellegrino noted he was trying a course of Lamotrigine, but if Mr. McCloud did not obtain satisfactory control with that medication, he would recommend considering an evaluation for possible surgical treatment, since at that point, Mr. McCloud would not have responded to four different anti-convulsant medications.  Dr. Pellegrino concluded that Mr. McCloud's seizure disorder was currently of sufficient severity as to prevent him from working regularly.

An EEG was performed on July 19, 2002, to evaluate for seizures. (R. 149, 229).  The results were normal with Mr. McCloud awake and asleep with no evidence of epileptiform activity.

On August 14, 2002, Dr. Pellegrino noted that he had gradually raised the dose of Lamictal, but Mr. McCloud continues to have two to three grand mal seizures a month. (R. 228).  Long-term monitoring to better define the seizures was discussed since Mr. McCloud had "effectively failed four anticonvulsant drugs" with a small likelihood that his seizures will be controlled.

Mr. McCloud was admitted to the Epilepsy Monitoring Unit of Sentara Norfolk General Hospital for observation from September 9 to September 16, 2002, to better characterize his seizures and look for any evidence of focal onset which might suggest the possibility of surgical management.

(R. 144, 146-148).  He was placed on long-term monitoring but neither sleep deprivation, decreasing his medication, or stopping his medication altogether, elicited any seizure activity.  After a week he had no significant complaints and was discharged home.

On September 27, 2002, Dr. Cohen completed a medical questionnaire. (R. 168-175).  Dr. Cohen indicated that he treated Mr. McCloud for a seizure disorder-poorly controlled and that Mr. McCloud had a fair prognosis. (R. 168).   Mr. McCloud had an MRI and an EEG that were within normal limits as per Dr. Pellegrino.  Dr. Cohen indicated that Mr. McCloud experienced symptoms several times a month and that pain was not applicable (NA). (R. 169-170, 173).   Dr. Cohen indicated that Mr. McCloud could sit or stand/walk for up to one hour and it was necessary for Mr. McCloud not to sit continuously in a work setting. (R. 170).   Dr. Cohen wrote "NA" under the sections asking about: Mr. McCloud's need to get up and move around, Mr. McCloud's abilities or limitations regarding lifting and carrying, and manipulation,  Mr. McCloud's need to take breaks, how many days Mr. McCloud would be absent from work, and whether Mr. McCloud needed a job that permitted access to a restroom. (R. 170-174).   Dr. Cohen did opine that Mr. McCloud's symptoms would likely increase if he were placed in a competitive work environment.  Further, Mr. McCloud could not do a full-time competitive job, even a low stress job, his impairment was ongoing and would last 12 months, and he was not a malingerer. (R. 172-173).

Dr. Cohen's notes from September 27, 2002, state that Mr. McCloud's headaches were under much better control. (R. 150).

Notes from Dr. Pellegrino dated October 21, 2002, indicate that Mr. McCloud continued to do well following discharge from the hospital in September 2002, with no seizures for the next several weeks. (R. 176).  However, he noted that recently he had a couple of seizures, so his dosage

12

of Lamictal would be increased. Examination was unremarkable and Dr. Pellegrino found that at this point, Mr. McCloud was really not a candidate for epilepsy surgery since he doesn't appear to be having truly uncontrolled seizures and since right now there was no evidence for any focal onset of his seizure activity. Dr. Pellegrino noted that other than for the seizures, Mr. McCloud was continuing to do fairly well, but he was somewhat depressed about his many problems, and they talked about getting Mr. McCloud a psychological evaluation. (R. 176).

Dr. Pellegrino completed a Seizure Impairment Questionnaire for Mr. McCloud on November 6, 2002. (R. 192-197). Dr. Pellegrino diagnosed Mr. McCloud with idiopathic seizure disorder, poorly controlled. (R. 192). Clinical history indicated that Mr. McCloud had a negative EEG and a negative MRI of the brain. Dr. Pellegrino indicated Mr. McCloud suffers tonic/clonic grand mal seizures with loss of consciousness approximately two to three times a month which last several minutes. (R. 193). He reported post-seizure manifestations including confusion, drowsiness, and a history of fecal or urinary incontinence, as well as injury during seizures. He noted Mr. McCloud was compliant in taking his medications. Dr. Pellegrino did not feel that Mr. McCloud could work at heights, with machines, or operate a motor vehicle. (R. 195-196). He also felt that Mr. McCloud would be absent from work more than three times a month as a result of the impairment or treatment.

On December 13, 2002, Thomas Kupke, Ph.D., a state consultative examiner, evaluated Mr. McCloud. (R. 198-200). Mr. McCloud indicated that his problems revolved around depression stemming from his seizure disorder that had complicated his ability to work. (R. 198). There were no reports of significant changes in behavior or personality other than increased irritability toward family members. He noted some reduction in routine interests, but his appetite was normal, his self-

13

esteem was intact, and he had no thoughts of death or suicide.  He reported that he did not drive but he was able to shop for himself and count change, and he could perform personal care. (R. 199).  On a typical day Mr. McCloud reported that he assists his children prior to school, reads, walks around the block, watches TV, listens to music, and performs chores such as vacuuming and cleaning the bathroom.  He has initial and middle insomnia and a low energy level.  Mr. McCloud appeared to have modest intellectual ability, and his persistence, behavior and pace were grossly normal. (R. 200).  He was capable of maintaining concentration and attention for moderately lengthy periods. His memory was adequate for meeting the demands of routine day-to-day functioning, he was capable of following simple instructions and could comprehend moderately complex commands or requests, he could maintain regular attendance, and he was capable of performing work activities. (R. 200).  Mr. McCloud had a global assessment of functioning (GAF) score of 65.[14]  The consulting psychologist concluded,

> He does not currently have florid psychiatric symptoms likely to prevent him from completing the typical workday or workweek, though he would appear to be at risk for having seizures on the job, which could do so.

(R. 200).

On December 23, 2002, Daniel Walter, Ps.D, a state agency mental health consultant, reviewed Mr. McCloud's records and determined that he did not meet any mental listing and was not precluded from performing simple and routine work activity due to any mental impairment. (R.

---

[14]  Global Assessment of Functioning Scale is the "clinician's judgment of the individual's overall level of functioning" on a  0-100 scale.  A 61-70 rating indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning, but generally the individual functions pretty well and has some meaningful interpersonal relationships.  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 31-32 (4th Ed. 1994).

203, 214).

On June 13, 2003, Dr. Cohen signed a statement reaffirming his findings in the September 2002 report, and indicating his belief that Mr. McCloud continued to be disabled. (R. 232). Dr. Pellegrino also signed a statement on June 16, 2003, indicating that he affirmed the findings contained in his November 2002 report, and that Mr. McCloud continued to be disabled. (R. 234).

After the ALJ issued his decision, Mr. McCloud submitted additional evidence of mental health treatment. (R. 243-62). In August 2003, he started to see psychiatrist William A. Yetter, M.D. (R. 262). He presented with a clinically depressed mood, sad affect and mild paranoia. Dr. Yetter prescribed Trileptal[15], Zyprexa[16] and Lexapro[17]. He referred Mr. McCloud to psychologist Patricia M. Fuss, PsyD for mental health treatment. Treatment notes indicated that he was making good progress in August 2003 (260, 258) and stable progress in October 2003. (R. 257). Mr. McCloud had a GAF of 60 on November 17, 2003, and December 30, 2003 (R. 253, 255), a GAF of 60-64 in January 2004 (R. 4252) and a GAF of 55 in February 2004. (R. 256).[18] Dr. Yetter completed a form in February 2004, indicating that Mr. McCloud had major depression, single episode with psychosis, he had a GAF of 50, and that he was markedly limited in 14 out of 20 areas. (R. 243, 246-

---

[15]     Trileptal (Oxcarbazepine) is indicated for use in the treatment of partial seizures. PDR, pp. 2381-82.

[16]     Zyprexa (Olanzapine) is indicated for use in the treatment of schizophrenia and bipolar disorder. PDR, pp. 1989-90.

[17]     Lexapro (Escitalopram Oxalate) is indicated for use in the treatment of major depressive disorder and generalized anxiety disorder. PDR, pp. 1282-83.

[18]     A GAF 51-60 rating indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with coworkers). Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 31-32 (4th Ed. 1994).

248). Dr. Yetter noted that the earliest date his limitations would apply was June 20, 2003. (R. 250).

Dr. Pellegrino completed a second Seizure Impairment Questionnaire on January 16, 2004, reiterating his finding on November 6, 2002, and reporting Mr. McCloud was currently taking Keppra[19] and Trileptal for his seizures. (R. 236-41).

### B. Testimony and Statements in the Record

In a questionnaire completed on March 29, 2002, Mr. McCloud indicated he had no warning prior to his seizures. (R. 76). He stated he had suffered several injuries due to his seizures including a fractured wrist, hurt shoulders, twisted ankles, bruises, and extensive dental work due to falling on his face. He has problems remembering due to his seizures, and difficulty reading due to blurred vision. (R. 80-81). Mr. McCloud indicated in additional questionnaires that his seizure medication causes sleepiness, dizziness, weakness, slurred speech, and blurred vision. (R. 66, 71, 93).

Mr. McCloud's administrative hearing was held on July 15, 2003. (R. 293-316). Mr. McCloud testified that at the time of his hearing he was living with his wife, and two children ages nine and twelve. (R. 300). He worked in the warehouse and as a truck driver for a furniture company for four or five years, but lost his job when the company went out of business approximately two years prior to the hearing. (R. 296-97). After he lost that job, he worked several temporary jobs. (R. 297-98).

He further testified he had two or three seizures while working for the furniture company which he did not report for fear of losing his job. (R. 298). After he lost that job, he started having seizures "real frequent." He stated he had a "partial" seizure the night before the hearing, resulting

---

[19]     Keppra (Levetiracetam) is indicated for use in the treatment of partial onset seizures. PDR, pp. 3234-35.

in impaired speech and tight muscles.  He stated his "major" seizures just shut him down. (R. 298, 304).  He described falling down, wetting himself, and biting his tongue. (R. 304-305).  He also said the muscles from his neck down tighten up, and sometimes take a week to loosen up again. (R. 304). He stated that while there is no regularity, he might have ten to twelve seizures a month. (R. 304).

During his hearing, Mr. McCloud stated he has a driver's license, but has not driven due to his seizure disorder for three or four years. (R. 299).  He was instructed not to drive until he went for six to eight months without a seizure.

He has knee pain in both of his knees, which has worsened over time, and has been seeing a doctor for his knee pain for two years. (R. 299-300).  He gets cortisone injections which help with the pain. (R. 306).  He can stand or walk continuously for about 45 minutes, and then needs to get off his feet. (R. 306).  He testified he can sit for about 45 minutes, but then he gets depressed thinking about things. (R. 306).  He is on medication for depression which does not help. (R. 307).

He does housework, prepares meals, and cuts two or three yards a week in his neighborhood to earn some income. (R. 301-302).  Mr. McCloud initially stated that he vacuums and sweeps, but later during his testimony, he stated he has his boys do this for him. (R. 301, 309).

Mr. McCloud's wife, Annette McCloud, testified that Mr. McCloud could have three or four seizures in one week, and then none the next week. (R. 310).  She stated that after a seizure, he is disoriented, and it may take five minutes or so for him to acknowledge that she is there talking to him.  When he comes to after a seizure, his vision is blurred, he is thirsty, and his muscles are tight. For a period of time after the seizures, he has difficulty remembering things. (R. 311).  Ms. McCloud testified her husband has constant headaches, complains of pain in his knees, and sore muscles.  She testified that he sleeps a lot, and that he does housework and yardwork on days when he is feeling

ok. (R. 312).  She also testified Mr. McCloud is depressed, and "his mood is low." (R. 312).

The vocational expert also testified at the hearing. The ALJ's hypothetical to the vocational expert asked her to consider an individual with Mr. McCloud's age, education and work experience, who possessed the residual functional capacity for light work with the following restrictions and limitations:

> the individual should be allowed an alternating sit/stand, no climbing, no work at unprotected heights or around dangerous machinery, and this individual is limited to noncomplex job tasks.

(R. 313). The vocational expert testified that the following jobs were available within the national and local economy: general information clerk, cashier, and ticket seller. (R. 313-314).

On cross-examination, the vocational expert testified that such an individual would not be able to work on a sustained basis if his impairments resulted in any of the following:  he would be required to be absent from work greater than three times per month; he is incapable of a low stress job; he would be able to sit, stand, or walk continuously for one hour in an eight-hour day; or, he has moderate to marked limitation in the ability to pay attention and to concentrate on a sustained basis in a work setting. (R. 314-315).

### III.  ANALYSIS

To qualify for a period of disability and disability insurance benefits under sections 216(I) and 223 of the Act, 42 U.S.C. §§ 416(I) and 423, an individual must meet the insured status requirements of these sections, be under age 65, file an application for disability insurance benefits and a period of disability, and be under a "disability" as defined in the Act.

Mr. McCloud meets all of the nondisability requirements of the Social Security Act;

however, the ALJ held that Mr. McCloud was not under a disability.  The Court's review of this decision is limited to determining whether there is substantial evidence in the administrative record to support the Commissioner's decision.  42 U.S.C. § 405(g) (1998); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. of New York v. NLRB, 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla" of evidence but may be somewhat less than a preponderance.  Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

In reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Hays v. Sullivan, 907 F.2d at 1456; Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the [Commissioner's] designate, the ALJ)."  Craig, 76 F.3d at 589.  The denial of benefits will be reversed only if no reasonable mind could accept the record as adequate to support the determination.  Richardson, 402 U.S. at 401.

Under Gordon v. Schweiker, 725 F.2d 231, 236 (4th Cir. 1984), a denial of benefits is not supported by substantial evidence if the ALJ "has not analyzed all evidence and . . . sufficiently explained the weight he has given to obviously probative exhibits."  The issue before this Court, therefore, is not whether Mr. McCloud is disabled, but whether the Commissioner's finding that Mr. McCloud is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law.  See id.

The Social Security Regulations define "disability" for the purpose of obtaining disability

19

benefits under Title II of the Act as the

> inability to do any substantial gainful activity[20] by reason of any medically determinable physical or mental impairment[21] which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

20 C.F.R. § 404.1505(a) (2004); see also 42 U.S.C. § 416(i)(1)(A).  To meet this definition, the claimant must have a "severe impairment"[22] which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy.[23]  20 C.F.R. § 404.1505(a) (2004).

---

[20]     "Substantial gainful activity" is work that (1) involves doing significant and productive physical or mental duties and (2) is done (or intended) for pay or profit.  20 C.F.R. § 404.1510; § 416.910 (2004). Substantial work activity is "work activity that involves doing significant physical or mental activities.  Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before."  Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized."  Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities.  20 C.F.R. § 404.1572 (2004).

[21]     "Physical or mental impairment" is defined in section 223(d)(3) of the Social Security Act, Title 42 U.S.C. § 423(d)(3), as an impairment that results from "anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."

[22]      The regulations define a severe impairment as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities . . . ."  20 C.F.R. §§ 404.1520(c), 416.920(c) (2004).

[23]     The Administration may satisfy its burden by showing that considering the claimant's residual functional capacity, age, education and work experience, the claimant is either disabled or not disabled based on medical-vocational guidelines, or "grids," published at 20 C.F.R., Pt. 404, Subpt. P, App. 2 (2004).   However, technical application of the grids is not always appropriate, and thus the Commissioner must rely on the testimony of a vocational expert to determine whether an individual claimant is in fact capable of performing substantial gainful activity available in significant numbers in the economy.  20 C.F.R. § 416.920(f) (2004); § 404.1520(f) (2004); Heckler v. Campbell, 461 U.S. 458, 466 (1983); SSR 83-10.

The regulations promulgated by the Social Security Administration provide that all material facts will be considered to determine whether a claimant has a disability.  The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled.  The ALJ must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals a condition contained within the Social Security Administration's official listing of impairments, (4) has an impairment which prevents past relevant work, and (5) has an impairment that prevents him from any substantial gainful employment.  An affirmative answer to question one or negative answers to questions two or four result in a determination of no disability.  Affirmative answers to questions three or five establish disability.  This analysis is set forth in 20 C.F.R. § 404.1520 (2004).

In this case, the ALJ addressed all five phases of the five-step evaluation process to determine whether Mr. McCloud is disabled within the meaning of the Social Security Act.  The ALJ first determined that Mr. McCloud has not engaged in substantial gainful activity since June 1, 2000. (R. 19).

The ALJ next found that Mr. McCloud suffers from depression, and a musculoskeletal impairment in his knees, but that neither of these conditions is severe.  The ALJ found that, "giving [Mr. McCloud] every benefit of the doubt," his seizure disorder causes significant vocationally relevant limitations and would be regarded as "severe" under the relevant guidelines. (R. 21).

However, at the next step of the sequential analysis, the ALJ found that Mr. McCloud's impairments did not, even in combination, meet or equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 (or 20 C.F.R., Part 404, Subpart P, Appendix 1 (2004)). (R. 22). In so finding, the ALJ specifically considered listings 11.02 and 11.03 pertaining to seizures but

found that the requirements were not met. (R. 22).

Fourth, based on the ALJ's evaluation of the evidence, the ALJ determined Mr. McCloud's residual functional capacity.[24] (R. 22-23). The ALJ considered Mr. McCloud's subjective complaints of limitations and pain from his condition but found them not fully credible in light of the record. (R. 22-23).  Instead, the ALJ found that he retained the functional capacity to perform light physical exertion that permits altering his position between sitting and standing, but which avoids unprotected heights, heavy machinery and detailed or complex tasks. (R. 23).  Given Mr. McCloud's residual functional capacity to perform a restricted range of light work, the ALJ determined that Mr. McCloud could not perform his past relevant work which required medium exertion and was semi-skilled. (R. 23-24).

At the fifth step, the ALJ must decide whether there are jobs other than his prior work which Mr. McCloud could perform considering his age, education, past work experience, and residual functional capacity. 20 C.F.R. § 404.1520(f) (2004).  If Mr. McCloud was capable of performing other jobs, he must be found not disabled. 42 U.S.C. § 423(d)(2)(A) (1998).  At this final step, the burden shifts to the Commissioner to demonstrate other jobs that Mr. McCloud would be able to

---

[24]     Residual functional capacity is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."  SSR-96-8p.  When assessing residual functional capacity,

> the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.

Id.  (footnote omitted.)

perform. See Heckler v. Campbell, 461 U.S. 458, 460 (1983). The ALJ considered Mr. McCloud's age, education, past work experience and residual functional capacity, the framework of rule 202.21 of the medical vocational guidelines, and the testimony of a vocational expert who appeared at the hearing. (R. 24). Based on this evidence, the ALJ determined that Mr. McCloud would be capable of performing jobs that exist in significant numbers in the national economy. Therefore, Mr. McCloud was found not disabled at step five of the sequential evaluation. 20 C.F.R. § 404.1520(a)(4)(v).

Mr. McCloud argues that the Commissioner's decision is not supported by substantial evidence because the Commissioner wrongly assessed his residual functional capacity by not accepting all of his asserted limitations from his headaches, knee pain, depression, and seizures, and erred by not granting more weight to the opinions of Dr. Cohen and Dr. Pellegrino that he was disabled by his seizures. This Court agrees that the Commissioner's decision is not supported by substantial evidence.

### A. ALJ's Evaluation of the Medical Evidence

The ALJ performed an evaluation of the medical evidence in the record. (R. 19-21). First, the ALJ discussed Mr. McCloud's right knee surgery in January 2000, arthroscopy in May 2001, and right ankle sprain, an injury he received while playing basketball in February 2002. (R. 19-20).

Next, the ALJ discussed Mr. McCloud's seizure disorder. (R. 20-21). He noted an electromyogram (EEG) on July 19, 2002, which was normal without evidence of epileptiform. (R. 20). The ALJ summarized Dr. Pellegrino's treatment records, and Dr. Cohen's treatment records to the extent each related to Mr. McCloud's seizures.

The ALJ summarized the form completed by Dr. Cohen indicating Mr. McCloud's seizure

23

disorder was poorly controlled, that he could not sit more than an hour or stand/walk more than an hour in a normal working day. (R. 20).  The ALJ also noted the questionnaire dated November 6, 2002, where Dr. Pellegrino advised Mr. McCloud had a poorly controlled seizure disorder with a loss of consciousness occurring two to three times a month, and that he would likely be absent from a job more than three times a month. (R. 21).

Lastly, the ALJ discussed Mr. McCloud's depression. (R. 21).   Dr. Kupke performed a consultative examination of Mr. McCloud on November 26, 2002. (R. 21).  Mr. McCloud described feelings of worthlessness since he could not work due to his seizure disorder, he could not play with his children as he had in the past, and he suffered from insomnia and low energy.  Examination revealed an estimated IQ in the borderline to low average range, and Mr. McCloud's affect was mildly restricted with depressed mood.  Dr. Kupke diagnosed adjustment disorder with depressed mood and a global assessment of functioning (GAF) of 65, consistent with mild symptoms.

The ALJ concluded:

> After carefully studying the medical evidence and testimony in this case, the undersigned finds the claimant retains the functional capacity to perform light physical exertion that permits altering his position between sitting and standing, but which avoids unprotected heights, heavy machinery, and detailed or complex tasks.  Although the evidence shows a medically determinable impairment capable of causing the symptoms alleged, it tends to confirm the undersigned's doubts as to the frequency and severity of the symptoms.

(R. 23).

### 1.  <u>The ALJ Erred by Not Giving the Treating Source Controlling Weight</u>

The ALJ erred when he dismissed the opinion of Mr. McCloud's treating neurologist, Dr. Pellegrino, and gave controlling weight to the state agency non-examining physicians.  Applicable

regulations provide that a treating source's[25] opinion on issues regarding the nature and severity of an impairment should receive controlling weight if it is not inconsistent with other substantial evidence in the record and is well supported by medically-accepted clinical and laboratory diagnostic techniques. 20 C.F.R. §§ 404.1526(b); 404.1527(d)(2); 416.927(d)(2) (2004).[26]  By the agency's own interpretative rulings, "[f]or a medical opinion to be well-supported by medically acceptable clinical and laboratory diagnostic techniques, it is not necessary that the opinion be fully supported by such evidence." See SSR 96-2p.  In addition, the opinion does not have to be consistent with all the other evidence in the record to have at least some deferential impact; it must only remain unassailable from substantial evidence to the contrary:

> Adjudicators must remember that a finding that a treating source's medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

---

[25]As defined in 20 C.F.R. § 404.1502 ". . . a treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.  Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s)."

[26]The Fourth Circuit's treating or attending physician rule as presented in published opinions predating the regulation hold that the medical opinion of a treating physician is to be given great weight and may be disregarded only if there is persuasive contradictory evidence on the record.  Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987); but see Craig, 76 F.3d at 590 (explaining that if a treating source's opinion is "not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight").

SSR 96-2p.

The ALJ should have given controlling weight to the opinion of Dr. Pellegrino, Mr. McCloud's treating neurologist for over five years at the time of the hearing in this case. During numerous examinations, Dr. Pellegrino documented Mr. McCloud's persistent seizure disorder, characterized by falling to the ground, tongue biting, incontinence, and mental confusion. (R. 185, 187). On July 12, 2002, Dr. Pellegrino reported Mr. McCloud has a "long history of complex partial seizures," and despite multiple different medications, continues to experience approximately two seizures per month. (R. 177). Dr. Pellegrino opined the seizure activity prevented Mr. McCloud from working regularly. On November 6, 2002, Dr. Pellegrino completed a Seizure Impairment Questionnaire for Mr. McCloud diagnosing a poorly controlled idiopathic seizure disorder which would cause Mr. McCloud to be absent from work more than three times a month. (R. 192, 195-96). Dr. Pellegrino reported on June 16, 2003, that Mr. McCloud continued to be disabled due to his seizures. (R. 234).

Dr. Pellegrino's opinion is based on Mr. McCloud's clinical history, and is not contradicted by other substantial evidence of record. (R. 192). The treating notes of Mr. McCloud's internist, Dr. Cohen, fully support Dr. Pellegrino's opinion. (R. 154-62). Moreover, Dr. Cohen independently opined Mr. McCloud was disabled from work. (R. 168-75, 232). Dr. Cohen first treated Mr. McCloud for seizures in June of 2001, and prescribed several medications to treat the disorder. (R. 162). On September 27, 2002, Dr. Cohen completed a medical questionnaire in which he indicated Mr. McCloud could sit, stand, or walk up to one hour in an eight-hour day, and could not work full time even in a low stress job due to his seizures. (R. 172-73). He reaffirmed his finding that Mr. McCloud was disabled on June 13, 2003. (R. 232).

The only evidence in the record which contradicts either Dr. Pellegrino's or Dr. Cohen's opinions that Mr. McCloud is disabled due to his seizure disorder comes from non-examining state agency sources who arrived at their decisions after reviewing the medical records of Dr. Pellegrino and Dr. Cohen.  Dr. Castle reviewed the record as it existed on June 18, 2002, and found Mr. McCloud was capable of  standing, walking or sitting about 6 hours in a workday, pushing and pulling, occasional kneeling and crawling, lifting and carrying light objects and performing tasks that do not require him to operate dangerous machinery, function frequently in high places, or climb ladders or scaffolds. (R. 224).  Dr. Castle also concluded Mr. McCloud's headaches were "associated with his seizure disorder, which is now stable with medications." (R. 224).  Dr. Castle explains his findings as follows, "[c]laimant has a [history of] seizure disorder.  However, when hospitalized and off medication had no seizures.  Diagnostic testing is negative.  His seizures are not documented as frequent." (R. 225). Dr. Castle's opinion was affirmed by another non-examining state agency physician, Michael Cold, D.O., on December 26, 2002. (R. 225).  The ALJ evaluated and considered the opinions of the state agency physicians, and gave them "significant weight." (R. 22).

Dr. Castle reviewed the records of Mr. McCloud's two treating physicians, both of  whom found Mr. McCloud disabled from work, and concluded Mr. McCloud was capable of performing light work.  Dr. Castle's opinion is not adequately explained or supported by the record.  Dr. Castle concluded that Mr. McCloud's headaches were "associated with his seizure disorder, which is now stable with medications." (R. 224).  There is only one report in the record reflecting a connection between one of Mr. McCloud's headaches and a seizure.  Mr. McCloud reported on June 22, 2001, that he had a seizure the night before resulting in several minutes of confusion, tongue biting, urination, and a severe right-sided headache which lasted through the time of the visit. (R. 160).

Notably, Mr. McCloud stated this was different, since his headaches were not usually tied to seizures.  The remaining examination notes, comprised of over nine reports of specific seizure activity and five reports of severe headaches, never mention the two coinciding with one another. (R. 151, 154, 158, 162, 176, 178, 179, 181, 185, 187, 189, 228).  More importantly, the record does not support Dr. Castle's opinion that Mr. McCloud's seizure disorder was "stable with medications." Dr. Pellegrino's June 10, 2002, treatment notes, taken eight days prior to Dr. Castle's review of the record, reflect that Mr. McCloud's seizure medication had been changed causing a few weeks of "fairly frequent seizures," but that he had been seizure free for one month. (R. 178).  The treatment notes from June of 2001 through June of 2002, the one year prior to Dr. Castle's opinion, reflect that Mr. McCloud had been placed on several seizure medications (Dilantin, Depakote, Tegretol, and Lamotrigine) in an effort to control his seizure activity.  (R. 160-61, 178, 181, 185).  During that year, Mr. McCloud did go for periods of time of up to a month without seizure activity; however, the record does not reflect a disorder which was "stable with medications."

The treatment notes recorded after Dr. Castle's review of the record further undermine his opinion.  For the remainder of 2002, Mr. McCloud reported approximately two seizures per month, with the exception of several weeks in the September time frame. (R. 176, 177, 228). On November 6, 2002, Dr. Pellegrino described Mr. McCloud's seizure disorder as "poorly controlled," and he reaffirmed this finding on June 16, 2003, prior to the ALJ's decision in August 2003. (R. 192). Therefore, the ALJ's decision to assign Dr. Castle's opinion "significant weight," was misplaced.

Despite the fact that (1) Dr. Pellegrino treated Mr. McCloud for over five years by the time of the administrative hearing, (2) Dr. Pellegrino's findings were consistent with those of Mr. McCloud's internist Dr. Cohen, and (3) Dr. Pellegrino is a neurologist, all factors which the ALJ

28

must consider pursuant to 20 C.F.R. § 404.1527, the ALJ chose to rely on the non-examining state

agency physicians. (R. 22-23).  The ALJ explained:

> Most times there was mention of seizures, there was also evidence of
> non-compliance through admission or laboratory testing.  During the
> September 2002 hospitalization, the claimant had no seizures even
> when his medicine was stopped.  Despite those negative findings, Dr.
> Cohen indicated that the claimant could not sit more than an hour or
> stand/walk more than an hour in a normal workday.  He gave no
> objective evidence to support that opinion.  Dr. Pellegrino's opinion
> that the seizures were poorly controlled was inconsistent with both
> his and Dr. Cohen's actual medical notes consistently indicating that
> the poor control was generally related to non-compliance.  There is
> no evidence to corroborate the doctors' opinions that the claimant is
> totally disabled.

(R. 23).  The ALJ notes three instances in the record to support his assertion that most of Mr.

McCloud's seizures were tied to his non-compliance with his medication, one in 1998 (outside of

the relevant time frame), one in June 2001, and one in August 2001. (R. 23).  Following August of

2001, there is no indication Mr. McCloud was non-compliant with his medications.  From September

2001 through the date of the ALJ's decision, in August of 2003, the record is replete with instances

of Mr. McCloud experiencing seizures despite taking his medication. (R. 176, 178-79, 185, 228).

Dr. Pellegrino specifically reported in July 2002, November 2002, and June 2003, that Mr. McCloud

was compliant with his medications.  (R. 177, 194, 234).  Further, Dr. Pellegrino mentions his

concern that Mr. McCloud was not adequately absorbing the anti-seizure medication in September

2001 and October 2001. (R. 184-85).  This would explain Mr. McCloud's  periods of low anti-

convulsant levels despite being compliant with his medications.

The ALJ "cannot 'pick and choose' only the evidence that supports his position." Loza v.

Apfel, 219 F.3d 378, 393 (5th Cir. 2000); see also Switzer v. Heckler, 742 F.2d 382, 385 (7th Cir.

1984) (explaining that the "attempt to use only the portions favorable to [the secretary's] position, while ignoring other parts, is improper").   In this case the ALJ chose to rely on the notations regarding Mr. McCloud's non-compliance with medications, and disregard the reports of compliance.   Based on the erroneous conclusion that Mr. McCloud's non-compliance caused his seizure episodes, the ALJ disregarded the treating neurologist's opinion that Mr. McCloud was disabled as a result of his seizures, and relied solely on the non-examining state agency physician's opinion that he was not disabled.   This was in error.

## 2.  <u>ALJ Failed to Consider the Combination of Impairments</u>

In reaching a conclusion about Mr. McCloud's residual functional capacity, the ALJ dismissed Mr. McCloud's knee pain and depression as non-severe, and did not address Mr. McCloud's headaches. As a result, the ALJ never considered the combined effect of Mr. McCloud's impairments. "Congress explicitly requires that 'the combined effect of all the individual's impairments' be considered, 'without regard to whether any such impairment if considered separately' would be sufficiently severe." <u>Walker v. Bowen</u>, 889 F.2d 47, 49 (4th Cir. 1989) (citations omitted); 20 C.F.R. § 404.1523 (2004).

> It is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render the claimant unable to engage in substantial gainful activity. In recognizing this principle, [the Fourth Circuit] has on numerous occasions held that in evaluating the effect of various impairments upon a disability benefit claimant, the Secretary must consider the combined effect of a claimant's impairments and not fragmentize them.
>
> As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments.

<u>Walker</u>, 889 F.2d at 50 (citations omitted).   The ALJ nowhere discusses the combined effect of Mr.

McCloud's seizure disorder, headaches, knee pain and depression.  The ALJ found:

> The evidence shows that the claimant was followed for some musculoskeletal complaints and underwent arthroscopy to both knees. He was able to play basketball and has received no follow-up treatment.  He has no "severe" musculoskeletal impairment.  He complained of some symptoms of depression, but the examining psychologist found only very mild symptoms and the claimant has received no ongoing treatment or medication for mental impairment. The depression is not "severe."

> The claimant has a history of seizures, and the medical evidence tends to show that they are fairly well controlled with medication when he is compliant.  The undersigned tends to favor a "not severe" rationale but, giving the claimant every benefit of the doubt, will find that the seizure disorder is "severe," causing more than a minimal effect on the ability to function.

(R. 21).

Although the ALJ acknowledges that Mr. McCloud alleges disability due to "severe headaches" (R. 18), the ALJ fails to indicate whether the headaches are severe or not severe at the second step of the analysis.  Further, the ALJ does not appear to have factored Mr. McCloud's headaches in when determining Mr. McCloud's residual functional capacity.  There are five treatment notes in the record discussing Mr. McCloud's severe headaches, including a notation that Mr. McCloud felt his headaches were more of a problem than his seizures. (R. 155, 159, 178, 179, 187).  Mr. McCloud  reported headaches several times a week which could last as long as a day, and described the headaches as severe, almost prostrating, and often associated with nausea. (R. 179, 187).  Dr. Cohen prescribed several medications for the headaches, including Fiorinal with Codeine, Maxalt, Propranolol LA, and Fioricet. (R. 151, 158, 159, 179).

In addition, Mr. McCloud suffers from a bilateral knee impairment.  Following surgery on both knees, treatment notes from January and March 2002 indicate Mr. McCloud returned to his

treating orthopaedic surgeon, John J. Schaffer, M.D. with complaints of bilateral knee pain. (R. 130, 132). Dr. Schaffer noted "bilateral patellofemoral symptoms," and prescribed knee braces and anti-inflammatory medication. The ALJ noted the state agency physicians found Mr. McCloud suffered from degenerative joint disease of the knees. (R. 22). Despite this, it does not appear that the ALJ considered the knee impairment in conjunction with Mr. McCloud's other impairments when assessing Mr. McCloud's residual functional capacity.

Lastly, the ALJ found Mr. McCloud's depression was non-severe, because Mr. McCloud was not in ongoing treatment, was not on medication, and the psychological consultative examiner, Dr. Kupke, reported "very mild symptoms." (R. 21). The ALJ made these findings despite Mr. McCloud's testimony that he was seeing a psychiatrist, and was on medication which was not helping (R. 306-307); despite Dr. A. Expinosa-Guanzon, M.D. beginning Mr. McCloud on a trial of Lexapro[27] on January 20, 2003 (R. 112); despite Dr. Kupke's diagnosis of adjustment disorder with depressed mood, chronic with possible borderline intellectual functioning; despite a GAF score of 50-60 by Dr. Fuss (R. 260); and, despite the state agency medical consultant's finding of moderate limitations in mental functioning in the ability to understand, remember and carry out detailed instructions and to maintain attention and concentration for extended periods (R. 201).

The ALJ erred by failing to consider the combined effect of Mr. McCloud's seizures, headaches, bilateral knee impairment, and depression when determining he was not disabled.

### B. Evidence Submitted Prior to Ruling by Appeals Council

In addition, evidence was submitted prior to the ruling by the Appeals Council which

---

[27]     Lexapro is indicated for the treatment of major depressive disorder. PDR, p. 3532.

indicates Mr. McCloud suffers from severe depression.  This "post-decision evidence" consists of

a psychiatric/Psychological Impairment Questionnaire from Mr. McCloud's treating psychiatrist,

William A. Yetter, M.D., along with his treating notes; medical records from treating psychologist,

Patricia M. Fuss, PsyD; medical records from treating orthopaedic surgeon, John J. Schaffer, M.D.,

and a Seizure Impairment Questionnaire from treating neurologist, Thomas R. Pellegrino, M.D. (R.

8).

        When evidence is submitted to the Appeals Council, as opposed to being incorporated in the

record prior to the ALJ's decision, 20 C.F.R. § 404.970 (1991)[28] "sets forth a mandatory rule that the

Appeals Council must consider new material evidence relating to the period prior to the ALJ

decision in determining whether to grant review, even though it may ultimately decline review."

Wilkins v. Secretary, Dept. of Health and Human Services, 953 F.2d 93, 95 (4th Cir. 1991) (en banc).

Here, the Appeals Council opined,

> We found no reason under our rules to review the Administrative
> Law Judge's decision.  Therefore, we have denied your request for
> review.
> . . .
> In looking at your case, we considered the reasons you disagree with
> the decision and the additional evidence listed on the enclosed Order
> of Appeals Council.  We found that this information does not provide
> a basis for changing the Administrative Law Judge's decision.

---

[28]     20 C.F.R. § 404.970 (1991) governs the circumstances under which the Appeals
Council is to review a decision of the ALJ.  Section (b) provides:

> (b)     If new and material evidence is submitted, the Appeals
> Council shall consider the additional evidence only where it relates
> to the period on or before the date of the administrative law judge
> hearing decision.  The Appeals Council shall evaluate the entire
> record including the new and material evidence submitted if it
> relates to the period on or before the date of the administrative law
> judge's action, findings, or conclusion is contrary to the weight of
> the evidence currently of record.

(R. 5-6).

Even if the Appeals Council declines to grant review, the evidence becomes part of the administrative record to be reviewed by this Court when determining whether substantial evidence supports the Commissioner's decision. Wilkins 953 F.2d at 96; see also Riley v. Apfel, 88 F. Supp.2d 572, 577 (W.D.Va. 2000); Hawker v. Barnhart, 235 F. Supp.2d. 445, 447 (D. Md. 2002).

A review of the post-decision evidence reveals that some of the evidence is new, material, and relates to the period prior to the ALJ's decision.  Evidence is new if it is not duplicative or cumulative, and evidence is material if  "there is a reasonable possibility that the new evidence would have changed the outcome." Wilkins 953 F.2d at 96.  The treatment records of Dr. Yetter and Dr. Fuss are the only medical records pertaining to Mr. McCloud's mental impairment from a treating source.  Dr. Yetter diagnosed Mr. McCloud with major depression, single episode, with psychosis, and noted positive clinical findings including hallucinations, suicidal ideation, blunt and flat affect, generalized persistent anxiety and difficulty thinking and concentrating. (R. 243-44).  Dr. Yetter reported a GAF score of 50. (R. 243).  He noted that the symptoms and limitations he noted applied beginning June 20, 2003, and his treating notes began August 1, 2003. (R. 250, 262).  The Fourth Circuit has held, "a treating physician may properly offer a retrospective opinion on the past extent of an impairment." Wilkins, 953 F.2d at 96. Dr. Fuss's records corroborated Dr. Yetter's, noting Mr. McCloud had symptoms of depression, sadness, anxiety and paranoia. (R. 256-57).  Dr. Fuss began treating Mr. McCloud on August 4, 2003. (R. 261).  The medical records related to Mr. McCloud's mental impairment are new and material.

These records were not before the ALJ when he made his finding that Mr. McCloud was not disabled.  Further, the Appeals Council, with very little explanation, found the evidence would not

have changed the ALJ's decision.  Despite this, the evidence shows that at least after June 20, 2003, prior to the ALJ's ruling, Mr. McCloud suffered from severe depression.  This lends additional support to the Court's finding that the Commissioner's decision is not supported by substantial evidence in the record.

## C.  Reversal

After a careful review of the record, this Court finds that substantial evidence does not exist to support the Commissioner's finding that Mr. McCloud is capable of performing a limited range of light work.  On the contrary, the evidence supports a conclusion that Mr. McCloud is disabled.

Sentence four of 42 U.S.C. § 405(g) states that in reviewing Social Security determinations:

> [t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing.

Here, a remand is not necessary as the Court can determine on the record that the combination of Mr. McCloud' physical and mental impairments renders him disabled. See Jenkins v. Sullivan, 906 F.2d 107 (4th Cir. 1990) (where further hearings would be without value, the court remanded to the Secretary with directions to award benefits).

This Court is convinced that any continued denial of benefits in the face of the existing record, regardless of whatever clarification may be added by a remand to allow the ALJ an opportunity to create a residual functional capacity that gives proper consideration to Mr. McCloud's physical and mental impairment, would not withstand the inevitable judicial scrutiny that would ensue.  It is therefore appropriate that final relief be ordered immediately.

Therefore, the record contains substantial evidence supporting a finding of disability, and

the Court should reverse and remand for an order granting benefits to the claimant.

## IV.  RECOMMENDATION

For the foregoing reasons, the Court recommends that the final decision of the Commissioner be REVERSED and REMANDED for payment of benefits.

## V.  REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within ten (10) days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(e) of said rules.  A party may respond to another party's objections within ten (10) days after being served with a copy thereof.

2. A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this

court based on such findings and recommendations.  <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Carr v. Hutto</u>, 737 F.2d 433 (4th Cir. 1984); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).


_____
                    /s/
                Tommy E. Miller
           United States Magistrate Judge

Norfolk, Virginia

November 8, 2005

## CLERK'S MAILING CERTIFICATE

A copy of the foregoing Report and Recommendation was mailed this date to each of the following:

Charles E. Binder, Esq.
Binder and Binder PC
215 Park Ave S
6th Fl
New York, NY 10003

Jeffry A. Sachs, Esq.
Kalfus & Nachman
PO Box 12889
Norfolk, VA 23541-0889


George M. Kelley, III, Esq.
Office of the United States Attorney
101 West Main Street
Suite 8000
Norfolk, VA  23510


Elizabeth H. Paret, Clerk


By _____
      Deputy Clerk

November        , 2005